THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. EARL ROBINSON, Appellant.

*Opinion filed November 27, 1974.*

John F. McNichols, Deputy Defender, Office of State Appellate Defender, of Springfield, and John F. Bergstrom, of Urbana, for appellant.

William J. Scott, Attorney General, of Springfield (James B. Zagel and Donald Hubert, Assistant Attorneys General, of counsel), for the People.

MR. JUSTICE DAVIS delivered the opinion of the court:

The defendant was convicted of the crime of murder by a jury verdict in the circuit court of Champaign County. A sentence of 50 to 100 years in the penitentiary was imposed. He has appealed directly to this court under the then-existing Illinois Supreme Court Rule 603 (Ill. Rev. Stat. 1967, ch. 110A, par. 603), and because of the time this case has been pending, we will retain jurisdiction of it.

The defendant raises two issues on appeal. First, he complains that the trial court erred in failing to give his requested jury instruction on accomplice testimony because two of the State's witnesses were allegedly accomplices. Second, he complains that the sentence imposed is excessive and should be reduced or vacated and the cause remanded for resentencing under the Unified Code of Corrections. Ill. Rev. Stat. 1973, ch. 38, par. 1001–1–1 *et seq.*

These issues require that the factual circumstances surrounding the homicide be detailed. Robert L. Dickey drove a cab for the Radio Cab Company. He died early on the morning of April 15, 1968, as the result of a single gunshot wound to the head. The defendant, Earl Robinson, was charged by indictment with his murder.

Shortly before midnight on the evening of April 14, 1968, Dickey was dispatched by radio to pick up

passengers at the Illini Union Building in Urbana, Illinois. His body was later found in his cab in the 1200 block on West Dublin Street in Urbana. The fare box contained $10.35 in cash, and a search of the scene failed to produce any suspects or eyewitnesses to the killing. The murder weapon was never found, although it was established from the slug removed from Dickey's head that it was a .38-caliber revolver.

The testimony revealed that two young men, Willie Hunter and Larry Ross, met the defendant by chance on the night of April 14, 1968, on Poplar Street in Urbana, and the three of them then went to the Illini Union Building to see if a dance was being held there. No dance was being held and nothing else happened there which was of interest to them. About midnight they went to the front desk in the lobby of the Union Building to call a taxicab. The desk attendant on duty at the time recalled seeing three black youths and directing them to a telephone at the desk from which one of them placed a call to the Radio Cab Company. The attendant could not describe the young men in any detail.

A dispatcher on duty for the Radio Cab Company received a call at 11:57 or 11:58 that night from a party wishing to have a cab come to the Illini Union Building. He did not recognize the voice on the telephone, but dispatched radio cab number 21 thereto, which cab was driven by Robert L. Dickey.

Willie Hunter and Larry Ross testified that approximately 5 to 10 minutes after the call had been placed, the cab arrived, and Hunter, Ross and the defendant got into it; that they all sat in the rear seat—Hunter on the right, Ross in the middle and the defendant on the left, directly behind the driver.

An employee of the Illini Union's billiard room testified that as he was leaving the building that night with a friend he saw three black youths, whom he could not identify, get into a Radio Cab Company taxicab at about

12:10. Larry Ross, who placed the call for the cab, said that he did not contemplate that all three would take the cab, but Hunter and Robinson asked if they could ride along, and the defendant had asked to be dropped off on Dublin Street. Once the three were in the taxicab, Ross testified that it was the defendant who directed the driver to turn off on Dublin Street.

Willie Hunter testified that the cab came to a stop in front of 1206½ Dublin Street. Hunter then lived on Beech Street, one block to the north of where the cab stopped. When it had come to a stop, both Hunter and Ross testified that the defendant produced a .32- or .38-caliber revolver and demanded the driver's money. Hunter denied having any prior knowledge that the defendant was carrying a gun, and indicated that he made no effort to intervene after the defendant produced the gun. Both Hunter and Ross testified that the defendant was holding the gun in his right hand when the driver made a sudden movement of his arms.

According to Hunter, the driver turned to the right and threw both arms up, and his left hand rested near the right side of his face with the palm toward the face. Ross testified that the driver's right arm contacted the gun, knocked it around so that the barrel was pointed momentarily at him (Ross); and that such action had taken place in just one motion, and there was no struggle between the driver and the defendant. Both Hunter and Ross testified that the defendant then shot the driver, discharging the gun once. That shot first entered the driver's left hand from the palm side, exiting through the back and then entered the head at the right temple. There were no powder burns in the immediate area of the head wound.

Hunter and Ross testified that immediately after the shot was fired, the three of them ran from the cab toward Willie Hunter's house on Beech Street.

A woman living at 1206½ Dublin Street heard what she described as something "like a bump," a car running

into a curb, or a "boom," between midnight and 12:30 a.m. She went to the door and saw a Radio Cab Company taxicab standing at the curb with the driver sitting in it with the right door of the cab standing open. She called the police, who arrived at 12:30 a.m. and found the body of Robert L. Dickey slumped over in the driver's seat, the cab lights and motor on, and the fare meter still running.

Hunter and Ross testified that when they and the defendant arrived at Hunter's house, Ross asked the defendant why he did it; and that the defendant answered that it looked like "we was game for anything." Hunter stated that this conversation with the defendant took place in his backyard and that the defendant remained there only five to six minutes, and never entered the house. Ross testified that the three of them went directly into the house after running from the cab and that they were together inside the house for 45 minutes before the defendant left. Following this conversation at Hunter's house, the defendant left and Ross and Hunter remained at the house.

Robert Knox, another State witness, testified that sometime after midnight the defendant arrived at the home of Elizabeth Brown, where he talked to Knox in the presence of Elizabeth Brown and Robert Hunter. According to this witness, the defendant told him that he had "just killed a man" and needed a ride out of town, but Knox refused to provide the ride. During the course of the conversation the defendant produced a gun described as a .32- or .38-caliber revolver to convince Knox that the shooting had actually occurred. The defendant offered to let Knox smell the barrel to prove it had recently been fired, but Knox declined because he had a cold and could not smell anything. The defendant then broke down the gun to show that a couple of rounds were missing. Elizabeth Brown testified for the defense that she was present during this conversation, but that she saw no gun and heard no mention of a shooting. She did admit that it

was possible that the defendant had shown the gun without her seeing it.

Willie Hunter said that he never talked to Ross about the shooting after the morning of April 15, 1968, although they had seen each other on several occasions since that time. Ross indicated that after that morning he had asked Hunter "a few odd questions" concerning the incident. Ross met the defendant at Willie Hunter's house four or five days after the incident, and he thought that Hunter was present, but wasn't certain. Ross said that at that meeting the defendant indicated that five persons knew about the shooting and that he had five bullets left.

Neither Willie Hunter nor Ross reported the shooting to the police until about a month and a half or two months after it occurred. At the time Hunter made his statement to the police, he was in jail on charges of forgery and theft. Ross stated that he had waited so long to tell somebody about the incident because of the defendant's comment that he had five bullets left; and that it was only after being convinced to do so by Knox that he went to the police on July 14, 1968. Knox made his statement to the police after going to the police headquarters on an unrelated matter on July 6, 1968. Ross, Hunter and Knox denied that they were coerced into making a statement or that anything had been offered in return for their statements.

During the conference on jury instructions, the State objected to the defendant's instruction No. 5, dealing with the weight to be given the testimony of accomplices, on the ground that there was no evidence that any person was an accomplice of the defendant. The court agreed and refused the instruction.

At a hearing in aggravation and mitigation of sentence, two witnesses testified for the defense: Odessa Nash, an aunt of the defendant, and the defendant himself. The State offered no evidence in aggravation and recommended a sentence of 50 to 100 years imprisonment. Defense

counsel recommended a prison sentence with a minimum term of no more than 20 years. The court imposed a sentence of 50 to 100 years.

The defendant argues that there was sufficient evidence to support a jury finding that Hunter and Ross were accomplices of the defendant. Such a finding would be very important to the defendant because it would entitle him to a cautionary instruction as to the reliability of the testimony of the only alleged two eyewitnesses to the shooting. The defendant requested the following instruction.

> "The Court instructs the Jury that there has been received in this case some evidence that certain persons may have been accomplices to the commission of the offense charged. If the Jury believes that [sic] a Witness in this case to have been an accomplice the Jury must look upon that Witnesses' testimony with great suspicion and great caution and must be satisfied from the accomplice's testimony and all of the circumstances in evidence of the guilt of the Defendant beyond all reasonable doubt."

It is not contested that if Hunter and Ross could be found to be accomplices, the defendant would be entitled to such an instruction. This case was tried prior to the effective date of Supreme Court Rule 451 (Ill. Rev. Stat. 1969, ch. 110A, par. 451), which requires the use of Illinois Pattern Jury Instructions—Criminal.

The test for whether or not one is an accomplice was definitively set forth in *People v. Hrdlicka* (1931), 344 Ill. 211, 221-222. There the court said:

> "An accomplice is defined as one who knowingly, voluntarily and with common intent with the principal offender unites in the commission of a crime. (1 Wharton on Crim. Evidence,—10th ed.— sec. 440; Jones on Evidence,—2d ed.—sec. 768; *People v. Sapp*, 282 Ill. 51; *Hoyt v. People*, 140 id. 588.) The generally accepted test as to whether a witness is an accomplice is whether he

himself could have been indicted for the offense, either as principal or accessory. If he could not then he is not an accomplice. The term 'accomplice' cannot be used in a loose or popular sense so as to embrace one who has guilty knowledge or is morally delinquent or who was even an admitted participant in a related but distinct offense. To constitute one an accomplice he must take some part, perform some act or owe some duty to the person in danger that makes it incumbent on him to prevent the commission of the crime."

Also, in *People v. Nowak* (1970), 45 Ill.2d 158, the court stated at pages 168 and 169:

"An accomplice is one who could himself have been indicted for the offense either as principal or accessory and if a witness is not an accomplice under this test it is not error to refuse to give a tendered instruction relative to the testimony of an accomplice."

The question is whether there is probable cause to believe that Hunter or Ross was guilty either as a principal, or on the theory of accountability.

There is no evidence that either Hunter or Ross took an active part in the killing, or in the attempted robbery. The only evidence against them is that of their presence with the defendant before, during and after the occurrence. In *People v. Richardson* (1965), 32 Ill.2d 472, 477, the court quoted from *People v. Clark* (1963), 30 Ill.2d 67, 72, as follows:

" 'While mere presence or negative acquiesence is not sufficient to constitute a person a principal to a crime, one may aid and abet, without actively participating in the overt act, and if the proof shows he was present at the crime without disapproving or opposing it, the trier of fact may competently consider this conduct in connection

with other circumstances and thereby reach a conclusion that such person assented to the commission of the criminal act, lent his countenance and approval and was thereby aiding and abetting the crime. (*People v. Washington,* 26 Ill.2d 207; *People v. Thicksten,* 14 Ill.2d 132.)' "

The evidence is clearly insufficient to support a finding of probable cause that either Hunter or Ross was an accomplice.

At the time of the occurrence and the trial, section 5—2(c) of the Criminal Code (Ill. Rev. Stat. 1967, ch. 38, par. 5—2(c)) provided in pertinent part that a person could be liable for the acts of another if:

"(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

There is no direct testimony to indicate that, prior to the occurrence, either Hunter or Ross knew that the defendant was armed, or had planned to engage in any illegal act. Indeed, it appears that Larry Ross had contemplated taking a cab home by himself, and there is no indication that Hunter or the defendant had pre-arranged a method of returning home, nor any plans for how to spend the remainder of the evening. Once in the taxicab, the defendant directed it to Dublin Street. No mention was made of a robbery attempt until the defendant pulled the gun on the driver and demanded his money. The shooting followed almost immediately, and there is no indication that either Hunter or Ross did anything to assist in the planning or commission of the offense.

Inasmuch as there was not probable cause to believe that Hunter or Ross could be found guilty of the offense either as principals or on the theory of accountability, they cannot be considered to be accomplices, and the

defendant was not entitled to the requested cautionary instruction.

The second issue raised by the defendant is that the sentence of 50 to 100 years was excessive. He asks for a modification by this court, or that we vacate the sentence and remand the cause to the circuit court for resentencing based upon the Unified Code of Corrections. The State argues initially that the Unified Code of Corrections does not apply to this case because section 8—2—4 of the Code (Ill. Rev. Stat. 1973, ch. 38, par. 1008—2—4) provides that:

> "If the offense being prosecuted has not reached the sentencing stage or a final adjudication, then for purposes of sentencing the sentences under this Act apply if they are less than under the prior law upon which the prosecution was commenced."

The State argues correctly that there is no substantive difference between the sentencing provisions under the statute applicable at the time of sentencing and the provisions of the Unified Code.

It is clear from the record that the sentence was not excessive under either statute. The killing here was without mitigating circumstances. It appears that the homicide occurred for no reason other than that the defendant thought his two companions were "game for anything." Under these circumstances, we hold that the sentence is not excessive, and the judgment of the circuit court of Champaign County is affirmed.

*Judgment affirmed.*