THE PEOPLE OF THE STATE OF ILLINOIS, PLaintiff-Appellee, v.
EDDIE F. CAMPBELL, Defendant-Appellant.

Fourth District   No. 4—87—0274

Opinion filed December 10, 1987.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and Linda Cullom, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Defendant Eddie Campbell was convicted in a jury trial of armed robbery in violation of section 18—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 18—2). The circuit court of Champaign County sentenced him to a term of 19 years' imprisonment.

On appeal, defendant raises four arguments: (1) the State failed to sustain its burden of proving him guilty of armed robbery; (2) the court erred in allowing an expert witness to give statistical testimony regarding a specimen of hair found in a piece of clothing linked to the robbery; (3) defense counsel was incompetent for not realizing the nature of the statistical evidence and seeking to strike the testimony; and (4) the court erred in failing to give the proper jury instruction after the jury had indicated it was deadlocked. Because of the first argument raised by defendant, we must recite in detail the evidence as shown by the record.

On September 11, 1986, a robbery took place at Willie's Pizza in Champaign, Illinois. At approximately 2 a.m., Wesley Morrison, the night manager, was working alone when he noticed someone standing behind him. At trial, Morrison described the man as a black man about 6 feet 2 inches tall, 170 to 180 pounds, thin, wearing a hood or mask, and holding a gun. The gunman asked him if anyone else was in the building. Morrison said no. The gunman then stated he wanted

the money out of the cash drawers. The gunman also asked Morrison where in the building the safe was located and told Morrison not to lie to him. The gunman then told Morrison to take all of the money and put it in a bag. Morrison placed the money, consisting of checks, currency, and coin rolls, into two bank bags used by Willie's Pizza. The gunman then asked Morrison to show him a place where he could lock Morrison up. The gunman took a carton of Kool cigarettes and a jacket before locking Morrison in the safe. Morrison stated the man spoke slowly and deliberately when talking to him. Morrison noticed nothing unusual about the gunman's speech.

Robbie Williams, defendant's ex-girlfriend, testified about a domestic dispute between defendant and herself. On December 2, 1986, she and defendant had a fight, and she wanted him arrested. She stated at trial that defendant was charged with hitting her, but she thought that the charges had been dropped.

Detective Michael Smith of the Champaign police responded to Williams' call. Williams testified that she gave Smith a brown paper bag which she had gotten from her bedroom closet. At the time, she shared that room with her daughter and defendant. She stated she did not know what was in the paper bag. All she had seen was clothing, but she thought the bag would contain evidence of a robbery. Smith opened the bag in her presence and showed her a mask or hood and some bank bags. She testified that she had not put those items in her closet, and she had never seen the mask before. She stated that while defendant lived with her he had a gun. She also testified that Detective Smith took a small plastic bag containing several bullets from the top of a dresser.

Williams admitted to prior convictions of burglary and theft. She also stated that the Champaign police were investigating a check forgery matter in which she was involved. In elaborating on this, she stated that two or three men had used defendant's driver's license to cash forged checks. Defendant's name had been put on the checks once or twice after he had been arrested for the armed robbery.

Detective Smith testified that he went to Robbie Williams' home on December 2. According to Smith, Williams gave him three bags, not just one. She handed him two bank bags—one marked "Willie's" and the other marked "Willie's Pizza." One bag contained a mask or hood and some checks. The other contained some coin wrappers that had been torn open. The third bag was a paper sack containing some men's clothing and shoes. Detective Smith testified the bullets in the plastic bag were found inside the bank bag containing the checks and masks.

A gun was recovered that belonged to defendant.

Morrison identified several of the items recovered by Detective Smith. He identified the bank bags as those belonging to Willie's Pizza. He recognized some of the recovered checks as ones received by the pizza store the night of the robbery. He stated the coin wrappers were for the same denomination of coins as were taken by the gunman. The mask looked like the mask the gunman was wearing except that Morrison thought that certain marks on the mask were more reddish and the area around the eyes seemed different. He also thought the mask used in the robbery was made of a heavier material, like that used in making backpacks. He stated the gun looked like the weapon used in the robbery except that he thought the gun had been a lighter shade of gray.

Andrew Pedolak, a special agent for the Federal Bureau of Investigation, testified for the State concerning his scientific analysis of a hair sample obtained from defendant and a hair found in the hood recovered from the bank bag at the Williams' home. Pedolak was certified as an expert in the examination, identification, and comparison of hair and textile fibers. He testified that hair has many characteristics which can be examined through microscopes. Most important to hair examination is the arrangement of all the characteristics to each other. Pedolak testified that this association gives uniqueness to the hair and allows him to make an association to a particular individual. He stated that the dark brown head hair of Negroid origin, which he removed from the hood, exhibited the exact same microscopic characteristics as the known head hair sample of defendant.

Larry Harper testified he was a fingerprint examiner for the Federal Bureau of Investigation. He recovered a latent palm print from a coin wrapper found in one of the bank bags. He compared it to defendant's palm print and determined that the palm prints were made by the same palm. The latent palm print could not have been made by any other palm.

Defendant testified in his own behalf. He stated that he had lived with Robbie Williams off and on for 10 months. He left her home the first part of December 1986. He stated that he was between 6 feet 5 inches and 6 feet 6 inches tall and weighed between 215 and 217 pounds. He claimed that in September 1986 he weighed 239. He admitted to prior convictions of burglary and attempt (burglary).

Defendant had a speech impediment which caused him to stutter. He had had the impediment all his life. Prior to defendant's testifying, and out of the presence of the jury, the court noted that "at least sometimes, if not all the time, *** [defendant has] a tendency to stut-

ter." The court then explained to defendant that he might be asked to repeat his statements as a result of his speech impediment.

Defendant testified that after the dispute on December 2 between Williams and himself, he left and went to his sister's house. Williams kept calling him, but he refused to talk to her. He finally called her back. Defendant stated she was angry and told him that she was going to call the police and tell them he was a robber.

Defendant denied robbing Willie's Pizza. Defendant stated that he knew several males named by Williams as her accomplices in the check forging matter. These men were all about 6 feet 2 inches in height and black. Defendant stated he could not remember where he was on September 11, 1986.

Defendant testified that he had never seen the bank bags or any of the checks that were recovered from Williams' home. Neither had he ever seen the hood found with the bags. He admitted that he had the gun for a period of about two weeks in November 1986.

He stated that Williams had coin wrappers and bank bags from places in Wisconsin which she kept in the closet. He had helped her take money out of the coin wrappers and put them into a bank. He stated he kept most of his clothes in a drawer or in his car but not in the closet.

Defendant purchased packages of Kool cigarettes from the jail commissary after his arrest, but he stated this was because he owed them to someone else. He usually smoked Pall Mall cigarettes.

In rebuttal, the State called two witnesses. Kenneth Roderick, a county correctional officer, stated that defendant stutters, but if asked to slow down, he talks fairly well. Mara Roughton, another county correctional officer, stated that when she woke defendant up on one occasion, he said something, and she understood what he said. He did not stutter, hesitate, or halt in his speech and made a complete sentence.

The jury deliberated for several hours and then sent a message to the court saying they were deadlocked. The court instructed the jury to continue deliberating. The jury returned a verdict of guilty. Defendant was subsequently sentenced to a 19-year term of imprisonment. Defendant filed a timely notice of appeal.

Defendant first argues he was not proved guilty beyond a reasonable doubt as a matter of law. In support, he stresses several specific facts: (1) Morrison, the night manager at Willie's Pizza, did not notice that the gunman had a speech impediment; (2) the description given by Morrison differs somewhat from that of defendant's description; and (3) much of the evidence was given to the State by a "convicted

felon with a penchant for fabrication."

A criminal conviction will be sustained unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276.) In this case, the evidence is circumstantial. The defendant's guilt need not be proved beyond any possibility of doubt. (*People v. Williams* (1977), 66 Ill. 2d 478, 484-85, 363 N.E.2d 801, 804.) Further, every link in the chain of circumstances need not be proved beyond a reasonable doubt. It is only necessary that the evidence be of a conclusive nature, and, considered as a whole, the evidence must produce, with reasonable and moral certainty, a conclusion that the accused committed the crime. (*People v. Armstrong* (1983), 111 Ill. App. 3d 471, 474-75, 444 N.E.2d 276, 280.) On review, we must view the evidence in the light most favorable to the prosecution and determine whether any reasonable trier of fact could have found the essential elements of the offense proved beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) Considered as a whole, we find the evidence sufficient to support the jury's finding of guilty.

Several important items associated with the robbery were recovered at a residence shared by defendant. The bank bags and checks were from Willie's Pizza. The coin wrappers were from the proper denomination of coins. Moreover, they were found in one of the bank bags, and one of the coin wrappers had defendant's palm print on it. A mask was found in the bank bag similar to the one the gunman was wearing. Analysis of a hair found in the mask showed the hair to have matching characteristics with a known sample of defendant's hair. A witness, Robbie Williams, testified the recovered items belonged to defendant. Finally, defendant had possessed a gun which was similar to the one used in the robbery.

The factors emphasized by defendant are not significant enough to take the decision away from the jury. Although the record indicates defendant had a speech impediment, there was evidence that defendant could speak clearly if he spoke slowly. Morrison testified the gunman spoke slowly and deliberately. The description of defendant by Morrison and defendant's description of himself in September 1986 differed. Morrison described the gunman as about 6 feet 2 inches tall and 170 to 180 pounds. Defendant is between 6 feet 5 inches and 6 feet 6 inches tall. Defendant testified that he weighed 239 pounds in September 1986. We find that this discrepancy is not fatal. It is overshadowed by the other evidence.

Finally, with respect to Williams, the jury had the opportunity to view her testify. Williams gave critical testimony linking defendant with the items of physical evidence. The inference of her lack of credibility was brought out for the jury when she admitted her previous criminal history and the current investigation concerning check forgery. Also, the jury knew of the stormy relationship between defendant and Williams. It was for the jury to determine her credibility and the weight to be given her testimony. *People v. Collins* (1985), 106 Ill. 2d 237, 261-62, 478 N.E.2d 267, 277.

Defendant's next argument relates to Andrew Pedolak's testimony about the hair analysis. Pedolak testified that the hair removed from the mask had the exact same microscopic characteristics as the known head hair sample of defendant. On cross-examination, Pedolak was asked about the ability to make positive identification through hair analysis. Pedolak stated that hair is not so individualized that he could make a positive identification. When asked to describe the value of a hair examination, Pedolak stated:

"A. I couldn't describe it as a positive means of identification, but I can tell you from my own experience what the significance of hair examination is. When I first started doing hair examinations, I took my own head hair, and pubic hair samples. All known samples, which I received in cases, I compare to my own known head and pubic hair samples, and I have done in excess of 25,000 hair examinations, and I have yet to find either a head hair or pubic hair that matches my own.

Q. So, what's that mean to you?

A. Well, it means to me that again, hairs are not a positive means. I can't positively say they are, because there may be someone out there in the world that has hair just like mine, what little bit I have, but I haven't found any yet. What it does say is that hairs are somewhat unique."

With respect to this testimony, the State's Attorney stated the following in closing argument:

"Now, as he said, when answering Mr. Dedman's questions, that's not like a fingerprint. That doesn't mean that there is not someone else in the world who has a head hair or head hairs with the exact identical characteristics as the Defendant's microscopically, but what did he tell us about his experience about using his own head hair, whenever he makes a comparison. Just to see if he can find one that's microscopically identical to his, or consistent with his, and I think he said 20,000 comparisons, and he hasn't found one yet. Now, that doesn't

mean that there is not someone out there in the world that has hair microscopically identical to his, but that is a fairly good narrowing down of the population. When he says that the hair found in this mask given to Detective Smith by the woman this Defendant was living with, it's microscopically identical to the Defendant's. Well, this certainly does narrow down the population, doesn't it?"

Defendant argues Pedolak's use of a statistic in his testimony and its emphasis in closing argument were improper as a matter of law, citing *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734. Defendant asserts the testimony was irrelevant, without a trustworthy foundation, and highly prejudicial. Therefore, continues defendant, it was plain error in the absence of a timely and proper objection. Recognizing that statistical testimony may constitute plain error in a case where the evidence is closely balanced (see *People v. Harbold* (1984), 124 Ill. App. 3d 363, 381, 464 N.E.2d 734, 748), we choose to address this question in the interests of maintaining a uniform body of precedent. *Hux v. Raben* (1967), 38 Ill. 2d 223, 225, 230 N.E.2d 831, 832.

We do not find the testimony in this case to be so prejudicial as to constitute reversible error. The testimony in the instant case is distinguishable from that in *Harbold*. In *Harbold*, the expert witness gave testimony of a statistical probability "for the purpose of establishing a historical fact." (*Harbold*, 124 Ill. App. 3d at 381, 464 N.E.2d at 748.) Even though statistics may be accurate, the court expressed concern that such testimony encourages "the jury to disregard evidential risks traditionally weighed in determining guilt or innocence, and focus[es] unfairly upon a numerical conclusion." (124 Ill. App. 3d at 383, 464 N.E.2d at 749.) *Harbold* was a case in which the evidence was circumstantial and closely balanced.

In the instant case, Pedolak's testimony was a recitation of his own experience. He did not offer a statistical probability but a summation of his experience in hair analysis. His statement was qualified by his repeated assertions that analysis of hair is not conclusive but that hair is "somewhat unique." Moreover, the statement was not offered by the State but brought out on cross-examination. The testimony, taken as a whole, was not made in such a way as to usurp the decision-making function of the jury.

The closing argument fairly summarized Pedolak's testimony. The State's Attorney did not dwell at length on the statistic. Neither did he argue it was, of itself, proof beyond a reasonable doubt. Accord *People v. Rainge* (1983), 112 Ill. App. 3d 396, 420, 445 N.E.2d 535,

551, *cert. denied* (1984), 467 U.S. 1219, 81 L. Ed. 2d 372, 104 S. Ct. 2667.

▪▪ Defendant next argues defense counsel was incompetent for not moving to strike Pedolak's testimony. As we have explained, Pedolak's use of a statistic was not so harmful so as to require reversal. Pedolak mentioned the figure of 25,000 in his response to defense counsel's question. The response created a borderline situation for defense counsel. A question existed as to whether the use of the statistic was an improper statistical probability. On appeal, defendant argues several ways in which defense counsel should have acted to negate the legal effects of the testimony. The impact of this argument is that defense counsel is required to perform a perfect trial. This argument ignores the reality of trial practice. Defendant is entitled to competent representation and not perfect representation. (*People v. Murphy* (1978), 72 Ill. 2d 421, 438, 381 N.E.2d 677, 685.) One trial strategy available to counsel was to ignore the statement and continue the cross-examination. This is what he did. He may have chosen to ignore the statement in order to avoid unduly emphasizing it to the jury.

▪▪ ▪ Finally, defendant argues the trial court erred in its instruction to the jury to continue deliberating. Defendant's trial concluded on March 12, 1987, and the 12 jurors retired to deliberate at 11:49 a.m. The following then ensued:

"THE COURT: Show conference in chambers. All counsel present. It's now 4:15. I informed the attorneys that I received a message a few minutes ago from the Bailiff, who had received it from the foreman, telling him that he claimed the jury was hung, and had not made progress in a while. After consulting with all counsel, and in view of our joint desire for a decision in this case, if possible, with this jury, I have instructed the Bailiff, by agreement of counsel, to carry the following message back to the jury. The message is as follows. You should continue your deliberations. That there will be no hung jury declared in this case until 9:30 at the earliest, and that they should continue their deliberations in view of the time and the efforts which both parties have put forth in this case. Anything you wish to add for the record, Mr. Difanis?

MR. DIFANIS [State's Attorney]: Not unless—(Mr. Difanis making gesture.)

THE COURT: Anything you wish to add for the record?

MR. DEDMAN [defense counsel]: No."

Defendant contends the instruction given was coercive and that the

court should have given the instruction approved in *People v. Prim* (1972), 53 Ill. 2d 62, 72, 289 N.E.2d 601, 609, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.

Great latitude must be accorded the trial court in the exercise of its informed discretion in determining how long a jury should be permitted to deliberate before a mistrial is declared, and the jury is discharged. (*People v. Preston* (1979), 76 Ill. 2d 274, 283, 391 N.E.2d 359, 363.) "Mere failure to give a *Prim* instruction to a deadlocked jury is not reversible error. The directive in *Prim* was aimed mainly at eliminating instructions to heed the majority." (*People v. Palmer* (1984), 125 Ill. App. 3d 703, 712, 466 N.E.2d 640, 648.) Several courts have held that it is not error for a trial court to instruct the jury to continue deliberating where the instruction is simple, neutral, and not coercive. (*People v. Palmer* (1984), 125 Ill. App. 3d 703, 712, 466 N.E.2d 640, 647; *People v. Farella* (1979), 79 Ill. App. 3d 440, 445-46, 398 N.E.2d 615, 619.) We find the instruction in this case was not such an abuse of the trial court's discretion as to call for reversal. Moreover, the instruction had the agreement of both attorneys, and trial counsel may have had reason for avoiding the *Prim* instruction.

Regardless of our decision to affirm the trial court's judgment, we are critical of the procedure used by the trial court relating to the disputed instruction. In our search of the record, we have failed to find a written instruction consistent with what was to be conveyed to the jury. If open court proceedings are not used, the proper method of communicating with the jury is by written questions with written answers. The written documents should be made a part of the record. The procedure followed in this case resulted in the bailiff's instructing the jury rather than the trial judge. While bailiffs may be trusted to convey certain information to jurors, the message in this case was an instruction and would have best been conveyed by the judge. We find no error, but disapprove of the process.

For the foregoing reasons, the judgment of the circuit court of Champaign County is affirmed.

Affirmed.

McCULLOUGH and KNECHT, JJ., concur.