THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE LOVE, Defendant-Appellant.

First District (1st Division)   No. 1—95—1893

Opinion filed November 25, 1996.—Rehearing denied January 22, 1997.

BRADEN, J., specially concurring.

Michael J. Pelletier and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

The defendant, Willie Love, was tried and convicted of first degree murder. He was given a 50-year sentence. Love claims errors occurred during trial and because of them he is entitled to a new trial. He contends:

    1. The prosecutor's comment during rebuttal argument improperly expressed her opinion of his guilt;

    2. The defendant's counsel was ineffective;

    3. The State improperly failed to reveal all pending charges against one of its witnesses.

For reasons that follow, we affirm the defendant's conviction and sentence.

FACTS

The defendant, Willie Love (Love), was tried and convicted of the murder of Alberto Rivera (Rivera).

Rivera was killed October 10, 1992.

Horace Harrington (Harrington) testified for the State.

Harrington was a member of the Conservative Vice Lords. Love was a high ranking member of that gang. Harrington knew who Love was and was able to identify him in court.

On October 10, 1992, Harrington went to a vacant lot near his home to buy drugs. The lot was near the corner of Ohio and Hamlin streets in Chicago.

That day, Love ran a drug business out of the lot. Love was not directly involved in selling the drugs.

When Harrington got to that lot that day, the sellers had temporarily run out of heroin. A line had formed. Harrington got in line. He was a few people behind Rivera. Harrington had seen Rivera other times when he went to buy drugs.

While Harrington waited in line, Love came in from a nearby alley. Love walked over to the person selling drugs, Sherman Strickland (Strickland). After they talked, Love left. When Love came back, he got into line. He stood a few feet behind Rivera. Love asked Rivera, "What the fuck up with you?" This is all Love said to Rivera. Rivera did not say anything to Love. Love walked toward Rivera.

Harrington noticed that Rivera was kind of high. Rivera had his head down and he put his hand into his pocket. He got out some money. Harrington said the money was "what he was going to buy with," but did not say how he knew that.

Love had a silver gun with a black handle. Love took his right arm and brought it around, like a pinwheel. When his arm was parallel to the ground, Love pulled the trigger.

Rivera fell to his knees, then on his face. Everybody scattered.

Harrington went to a nearby store and called someone from a phone outside. Harrington saw Love get into Love's black and red Blazer and leave. Love drove down Ohio toward Avers and straight down Pulaski. There was someone else in the truck. Harrington heard four shots come from the truck. He did not see who did the shooting.

Harrington used heroin every day. He had not used it for a few days before trial because he had been in police custody for failure to appear as a witness. Harrington had not appeared on his own because his family was afraid.

Terry Williams (Williams) testified for the State.

Williams admitted that he was previously convicted of theft, burglary, and delivery of a controlled substance. He told the jury he had been to the penitentiary twice and was now in jail again.

He said that he had a "sell of a controlled substance" case that had been pending since sometime in 1992. It had not yet gone to trial. Williams admitted that he did not want to go to jail again. He said his testimony at Love's trial would not help the disposition of his own case.

Williams knew Love. Williams also was a member of the Conservative Vice Lords.

Williams sold drugs for Love's brother. Love dropped off "packs" and collected money for the operation.

On October 10, 1992, Williams worked security for the drug

operation at the vacant lot. He stood at a corner near the place where the drugs were being sold. He watched for police.

The first time Williams saw Love that day, Love was driving around with someone named "Annie Miller." He was driving a red Blazer with dark tinted windows. Love parked his car.

There was a commotion in the lot. Love left. He drove off and then came back around. He parked the Blazer and left it. Love walked toward the lot and up to Rivera.

Love left the lot again. Love got into the Blazer and drove off. When Love came back, he jumped out of the Blazer with a gun. He went toward Rivera. Rivera began to argue that he shopped there every day and he did not want anyone butting in line.

Williams saw Love "exchange words" with Rivera. Rivera was not standing in line.

Love cocked his arm back, then "went forward with it." The gun went off, striking Rivera in the head. Love ran off and jumped in the Blazer.

After Love left, Strickland and another person working security, David Lam (Lam), approached Rivera. They took money out of his hand and pockets.

Williams went to the other side of Hamlin. Strickland came up to him and said something. Williams left shortly after the shot was fired.

Love did not return to the area. Williams went home.

Both parties stipulated to the testimony of Doctor Robert Kirshner (Dr. Kirshner), a forensic pathologist. He performed the autopsy on Rivera.

Rivera was injured by a single contact gunshot wound. The entrance of the wound was on the top of Rivera's head, near the midline. The bullet moved in an anterior direction down and toward the left. The bullet exited through the mandible, fracturing it. A photograph showed an exit wound under Rivera's chin.

Cordell Butler (Butler) testified for Love.

Butler had been on probation since May 1993 for delivery of a controlled substance.

Butler worked for Love selling narcotics. Love's job in the drug operation was to make sure everything was in order.

Butler no longer sold drugs because he had been caught. Butler was a former Conservative Vice Lord. He had quit a few months before trial.

On October 10, 1992, Butler worked for the drug operation in the vacant lot. He collected money from the customers. He was working next to the "Pack Man," the person who sells the narcotics.

He remembered seeing a "Puerto Rican fellow" who was there to buy drugs.

According to Butler, Rivera bought $110 worth of drugs, or 11 bags, from Strickland. The bags were very small.

After Rivera bought the drugs, he began walking to an alley. At this point, another customer in the line, a heavyset "black guy," caught Rivera about 20 feet from the alley. The second man had purchased one or two bags of drugs.

The second man grabbed Rivera by the collar. He pulled out a gun and began to hit Rivera on the top of his head. The second man told Rivera to give him his drugs. He hit Rivera two or three times. While he was being struck, Rivera called out to Strickland, asking for help. The third time, the gun went off.

Rivera was not facing the second man when the shot went off.

Rivera collapsed after he was shot. Butler and Strickland looked around to make sure they were not shot. Strickland jumped into the doorway. Two customers ran out the front.

Butler said Rivera was being robbed. Butler said the shooter did not take anything from Rivera.

After Rivera was shot, Butler, Strickland, and Lam went over to him. Lam took something from the body, but Butler did not know what it was. Butler ran from the area. Lam later told Butler that he took about six or seven heroin packets.

The man who shot Rivera was tall, about 6 feet 5 or 7. He was wearing all brown clothing. Butler did not know him.

Love was in the area the day the shooting occurred. He did not shoot the gun. Love did not argue with or push Rivera.

Two police officers also testified during Love's defense case. The police addressed inconsistencies between Williams' and Harrington's statements to the police and their testimony at trial. The inconsistencies involved such details as whether Love pushed Rivera and whether Love hit Rivera on the head.

The jury started deliberating after lunch. It returned a guilty verdict at 8:15 p.m. the same day.

Love was given a 50-year-sentence.

OPINION

1. Did the Prosecutor's Comment During Rebuttal Argument Improperly Express Her Opinion of the Defendant's Guilt?

After summarizing the evidence during rebuttal argument, the prosecutor concluded:

"View the evidence. Think about the evidence. We're certain

you're going to come to the same conclusion we have come to. He's been proven guilty beyond a reasonable doubt, beyond a scintilla of doubt. The man is guilty of first degree murder. Please find him so."

Love claims that the prosecutor's comment expressed her personal opinion about his guilt. He claims that this comment constitutes reversible error.

Love's attorney did not object to the comment. Love argues the comment was plain error.

■ A defendant must object to an error at trial and include the objection in his or her post-trial motion in order to preserve the error for review. *People v. Mullen*, 141 Ill. 2d 394, 401, 566 N.E.2d 222 (1990). If an error is not properly preserved for appellate review, the plain error rule may be invoked where the evidence is closely balanced or where the error adversely affected the defendant's right to a fair trial. *Mullen*, 141 Ill. 2d at 401-02.

■ Given the strength of the State's case, we find Love waived this issue. Even if we were to consider the alleged error, we would note that prosecutors have a great deal of latitude during closing argument. For a prosecutor's remark to be considered reversible error, it must have caused such substantial prejudice to the defendant that it would have affected the verdict. *People v. Myers*, 246 Ill. App. 3d 542, 547, 616 N.E.2d 633 (1993).

A prosecutor cannot express his or her opinion of the defendant's guilt. *People v. Brown*, 253 Ill. App. 3d 165, 176, 624 N.E.2d 1378 (1993). For example, in *People v. Roach*, 213 Ill. App. 3d 119, 124-25, 571 N.E.2d 515 (1991), this court found reversible error where repeated comments expressing the prosecutor's opinion were not based on the record, but instead were intuitive judgments that lay within the jury's province.

Prosecutors may, however, state an opinion that is based on the record or on a legitimate inference derived from the record. *Brown*, 253 Ill. App. 3d at 176. For example, in *People v. Hill*, 98 Ill. App. 2d 352, 355-56, 240 N.E.2d 801 (1968), a comment concerning the prosecutor's opinion of the defendant's guilt was not improper because it was reached after he "listened to the case."

In this case, the prosecutor said that she had come to the conclusion that the defendant was guilty after she summarized the evidence. Her comment clearly was linked to that summary. It was not intended to place the authority of the prosecutor's office behind her argument. The single comment was not error.

2. Was Defendant's Counsel Ineffective?

Love argues that he was prejudiced because his counsel was ineffective.

■ To prove that defense counsel was ineffective, a defendant must first show that the defense counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525, 473 N.E.2d 1246 (1984). The defendant then must show that this deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *Albanese*, 104 Ill. 2d at 525. This means that the defendant must show that counsel's errors actually adversely affected the outcome of the case. *People v. Dooley*, 227 Ill. App. 3d 1063, 1067, 592 N.E.2d 1112 (1992). The defendant cannot merely speculate that the results would have been different. *People v. Holman*, 164 Ill. 2d 356, 369, 647 N.E.2d 960 (1995).

Love claims that his counsel was ineffective in three ways.

*Accomplice Instruction*

■ Love argues his counsel was ineffective because he failed to ask the trial court to give the accomplice instruction, Illinois Pattern Jury Instructions, Criminal, No. 3.17 (3d ed. 1992) (hereinafter IPI Criminal 3d No. 3.17), "Testimony of an Accomplice." That instruction reads:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." IPI Criminal 3d No. 3.17.

The threshold question is whether Williams can be considered an accomplice. If not, there would be no reason for the trial judge to give the IPI Criminal 3d No. 3.17.

■ The test for determining whether a witness is an accomplice, entitling the defendant to the accomplice-witness instruction, is whether "there is probable cause to believe that [he] was guilty as a principal, or on the theory of accountability." *People v. Cobb*, 97 Ill. 2d 465, 476, 455 N.E.2d 31 (1983), quoting *People v. Robinson*, 59 Ill. 2d 184, 191, 319 N.E.2d 772 (1974).

To be considered an accomplice, the witness "must take some part, perform some act or owe some duty to the person in danger that makes it incumbent on him to prevent the commission of the crime." *People v. Robinson*, 59 Ill. 2d at 191, quoting *People v. Hrdlicka*, 334 Ill. 211, 221-22, 176 N.E.2d 308 (1931). An accomplice is not somebody who was an admitted participant in an offense distinct from the one at bar, even if the offense was related to the

charge being tried. *People v. Henderson*, 142 Ill. 2d 258, 314-17, 568 N.E.2d 1234 (1990); *People v. Carlson*, 224 Ill. App. 3d 1034, 1043, 586 N.E.2d 1368 (1992).

Williams was part of the defendant's drug operation. He was kind of a security guard. It was the State's theory at trial that the killing of Alberto Rivera was defendant's method of keeping the peace at the scene of the drug-dealing business.

At the same time, there is no evidence Williams knew anything about the killing before it happened or that he had any direct role in it. Nor is there any evidence that Williams ever was led to believe any law enforcement agency considered him a suspect in the murder.

Still, Williams was part of the drug operation and was acting to further its interests. The murder apparently, although not clearly, was intended to protect that same business. Since Williams was part of the unlawful enterprise that the defendant arguably was seeking to further, by shooting Rivera, we find there is probable cause to believe Williams was guilty of murder under accountability principles. See *People v. Terry*, 99 Ill. 2d 508, 460 N.E.2d 746 (1984).

Under some circumstances, a defense lawyer would be ineffective for failing to request the accomplice witness instruction. In *People v. Butler*, 23 Ill. App. 3d 108, 318 N.E.2d 680 (1974), where ineffectiveness was found, the accomplice was a crucial State witness in a close case. And in *People v. Campbell*, 275 Ill. App. 3d 993, 657 N.E.2d 87 (1995), failure to ask for IPI Criminal 3d No. 3.17 was ineffectiveness where the witnesses admitted their role in the crime and both admitted they had benefited from their agreements to testify for the State.

On the other hand, we have held that the general credibility instruction, telling the jury to consider any interest, bias, or prejudice the witness might have, is sufficient to cure any prejudice caused by the failure of defense counsel to request the accomplice instruction. *People v. Lewis*, 240 Ill. App. 3d 463, 609 N.E.2d 673 (1992).

■ In this case, the State contends the failure to ask for IPI Criminal 3d No. 3.17 must have been a strategic decision. Even if we were to speculate on defense counsel's reasons for not asking for IPI Criminal 3d No. 3.17, we can't think of one. He should have asked.

Even an able and experienced defense lawyer can make a mistake. Whether the oversight in this case amounts to ineffectiveness of counsel is a question we need not decide. The jury heard about Williams' prior convictions and a pending drug charge, in addition to his unsavory occupation. Defense counsel vigorously argued Williams' lack of credibility. Given the record in this case, we cannot see how the giving of IPI Criminal 3d No. 3.17 would have affected

the probable outcome of this trial. Because the second prong of the *Strickland* test has not been satisfied, there is no need to inquire further into counsel's performance on this point. Failure to prevail on either prong of the *Strickland* two-prong test is sufficient to defeat a claim of ineffectiveness of counsel. *People v. Pecoraro*, 144 Ill. 2d 1, 13, 578 N.E.2d 942 (1991).

*Hearsay Testimony*

■ Love claims he was prejudiced by his attorney's failure to object to hearsay testimony from Williams.

During his direct testimony, as Williams was about to relate something that Strickland had told him, Love's counsel objected. The objection was sustained.

During Williams' cross-examination, Williams explained that he did not hang around long after the shot was fired. In explaining this, Williams said, "I hung around long enough until Sherman Strickland told me that Mr. Love said, yaw, haven't seen anything, you know, just you know, lay low." This statement was not responsive to the defense lawyer's question. No motion to strike the answer was made.

Love argues that this hearsay comment lent additional weight to the State's argument during closing that it was possible other witnesses failed to testify out of fear. More likely, any comments referring to witnesses' fear about testifying referred to the fact that Harrington did not originally show up at trial because his family was afraid.

Even if Williams' testimony was objectionable, Love's attorney's failure to object to it well may have been part of his trial strategy. Love's attorney did not react to Williams' comment in any way. He continued to question Williams on the testimony he had given during direct examination. Love's attorney reasonably could have believed that he would have led the jury to suspect he was hiding something if he objected and decided not to call attention to what Williams had said. See *People v. Campbell*, 163 Ill. App. 3d 1023, 1031, 516 N.E.2d 1364 (1987) (ignoring hearsay comment acceptable trial strategy).

Even if Love's attorney's failure to object was not trial strategy, we would find that Love was not prejudiced by it. While the statement implicated Love, it was not a crucial piece of evidence. The two eyewitness accounts were much more crucial. Had the statement been excluded, there is no reasonable probability that the jury would have acquitted Love. See *People v. Winchel*, 159 Ill. App. 3d 892, 903, 512 N.E.2d 1298 (1987). We cannot say every inartful question that draws a damaging answer amounts to ineffective assistance of counsel.

*Closing Argument*

■ Love claims he was prejudiced because his attorney failed to object to the prosecutor's comment that she believed Love was guilty.

As we have said, the comment was not error. Therefore, we find that Love was not denied effective assistance of counsel because of his attorney's failure to object to the remark.

3. Did the State Improperly Fail to Reveal All Charges Pending Against One of its Witnesses?

■ Love claims that he was prejudiced when the State failed to reveal all pending charges against Williams. Love argues this failure violated his right to due process. And he maintains the State violated discovery procedures set out in Supreme Court Rule 412 because it did not disclose "material or information within [the State's] possession or control which tend[ed] to negate the guilt of the accused as to the offense charged." 134 Ill. 2d R. 412(c).

During direct testimony, Williams admitted that he was previously convicted of theft, burglary, and delivery of a controlled substance. He admitted he had "a drug case pending."

This court granted Love's request to include a supplemental record. The supplemental record contains documents showing that Williams had a second drug case pending at the time of Love's trial. The two cases were tried and sentences imposed at the same time.

The State's failure to disclose the second pending charge was improper and inexcusable.

However, we find that Love was not prejudiced by the State's failure to disclose Williams' second drug case. A new trial is not warranted for a violation of Rule 412 unless the violation was "material," meaning it might have affected the outcome of the trial. *People v. Dugan*, 237 Ill. App. 3d 688, 692, 604 N.E.2d 1117 (1992).

Love argues that this case is similar to *People v. Preatty*, 256 Ill. App. 3d 579, 589-90, 627 N.E.2d 1199 (1994). In *Preatty*, the court found a Rule 412 violation "material" and granted the defendant a new trial. The facts of the case were relatively simple and the verdict depended on a credibility determination between the State's witness and the defendant. The State's witness had been allowed to plead guilty to a felony and was placed on pretrial diversion without a conviction with the prosecutor's approval. The court found that the State's failure to disclose a possible motivation to lie, known to the prosecutors, undermined confidence in the verdict.

This case is unlike *Preatty* in that the jury was aware that Williams was going to be tried for at least one crime. It was aware that Williams had been convicted for other crimes and twice sentenced to

the penitentiary. It heard Williams deny he had made any deals with the State. In his closing argument, Love's attorney insinuated that even if Williams had denied making any deals, he was testifying because he was afraid of what would happen in his pending drug case. It is difficult to imagine that the jury, having heard so much about Williams' checkered career, would have arrived at a different verdict had it been aware of the second charge.

CONCLUSION

We affirm the defendant's conviction and sentence.

Affirmed.

BUCKLEY, J., concurs.

JUSTICE BRADEN, specially concurring:

I agree with the majority's conclusion affirming defendant's conviction and sentence. However, I am compelled to disagree with the finding that the accomplice instruction should have been requested by defense counsel concerning the testimony of Williams. This instruction should be given if, from the totality of the evidence and reasonable inferences drawn from the evidence, there is probable cause to believe not merely that the witness was present and failed to approve of the crime, but that he participated in the planning or commission of the crime. *People v. Henderson*, 142 Ill. 2d 258, 315, 568 N.E.2d 1234, 1261 (1990).

Even though Williams was an active participant in the drug operation in which defendant was involved, he was not a participant in the commission or planning of the murder of Rivera by Love. By all indications, Williams did not know or foresee that this unfortunate incident would occur. There is strong support in the evidence that the murder of Rivera was a separate, independent, and unconnected crime and that Williams did not participate in its commission or planning.

For these reasons, I believe that defense counsel was not ineffective because of his failure to request the accomplice instruction.