THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
REGINALD SMITH (Impleaded), Defendant-Appellant.

First District (5th Division)   No. 76-1499

Opinion filed June 23, 1978.—Rehearing denied July 21, 1978.

Stanley L. Hill, of Cole, Brayman & Hill, Ltd., of Chicago (Paul A. Lewis, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Patricia Bender, Lee T. Hettinger, and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendant was convicted of murder, attempt murder, armed robbery, attempt armed robbery and aggravated battery (Ill. Rev. Stat. 1975, ch. 38, pars. 9—1, 18—2, 8—4, 12—4), and was sentenced to concurrently serve 15-25 years in the Illinois Department of Corrections. On appeal, he contends that: (1) he was not convicted beyond a reasonable doubt, and (2) his right to cross-examine a witness was improperly denied.

At a bifurcated proceeding wherein defendant received a bench trial and co-defendant Arnold Wilson received a jury trial, the following evidence pertinent to this appeal was adduced.

*For the State:*

*Patrick Carey, Chicago Police Officer*

On July 19, 1975, at approximately 8:11 p.m. he and his partner went to 9401 South Ashland in response to a call. Upon arriving at the scene he saw Samuel Pugh, who was bleeding from the face and arm, lying on the sidewalk in the lap of Margaret Bradford. He entered the front of the meat store and saw a man named Carrellas who was bleeding from the arm and chest sitting on the floor. He sent a radio message for a squadrol to take these men to the hospital. Upon entering the back of the store, he saw Tennis Draper, lying on the floor in a pool of blood and obviously dead, and Terry Howes, who was unconscious and bleeding from the neck. These men were removed from the scene.

On cross-examination he acknowledged that Margaret Bradford told him at the scene that Terry Howes had opened the back door when Reginald Smith and the other two offenders came in.

*Samuel Pugh*

He owned a meat store at 2620 East 87th Street with Tennis Draper. He also owned meat stores at 4252 West Cermak and 9401 South Ashland with Tennis Draper and Jimmy Carrellas. On July 19, 1975, at approximately 4 p.m. he talked to defendant at the South Ashland store, and when Smith asked him where he would be at 7 that evening, he told

him he would probably be there at the store. Sometime between 7 and 7:30 that evening he was in the rear of the store with Tennis Draper and Terry Howes, when Smith, Arnold Wilson and Robert Jones entered. When Tennis Draper asked, "What do you guys want?" both Wilson and Jones pulled out pistols and said, "This is a hold-up" or a "stick-up." Jones went to the front of the store and returned to the back room with Margaret Bradford and Jimmy Carrellas while Wilson walked around looking through drawers and saying that he wanted money. He and Tennis Draper were both talking to defendant saying, "Reginald, this is not necessary" and "Reginald, you shouldn't do this, we know you." When Draper asked defendant, "How come you are doing this?" Smith replied, "This is the only way I can get any money." Draper offered defendant a check, but he replied, "We don't want no check, we want cash." Draper said that a check was the only thing they had, began to write one out, and asked to whom and for how much it should be made out. Smith instructed Draper to make it out to him and for $500. Draper wrote out and gave Smith the check after which Smith, Wilson and Jones talked together for approximately 15 seconds. Jones then walked over to where he and Draper were still standing and shot Draper in the face. Jones also shot Pugh in the face, right under his right eye. He fell forward, heard some more shots, and was shot twice in back. After lying on the floor until he heard the shooting stop, he got up and asked Margaret Bradford, his sister, to take him to the hospital. He was bleeding badly, so he lay down on the ground, resting on his sister's knee, until the ambulance came.

On cross-examination he acknowledged that he had known Smith since March 1975 when he contracted with Smith to have some work done at the West Side store. The contract called for a payment of $1,300. Before Smith started working he gave him $800, but he stated that because Smith did not complete the work, he did not give him the $500 balance. He acknowledged that Smith delivered meat for him and always brought back the money he received from customers, but denied that Smith asked him for his $500 or told him that he would settle for installment payments of $50 a week. He admitted that during the course of the robbery, he did not see Smith holding a gun, but denied that Smith asked him to tell Wilson and Jones that he hadn't been paid the $500, or that Smith ever told Jones to leave the people's wallets alone.

*Bertha Pugh*

In the summer of 1975 her brother, Terry Howes, worked at South Shore Meats for Sam Pugh, her husband. She saw Terry Howes on July 18, 1975, and he seemed to be in perfect health. She next saw him on July 20, 1975, in the intensive care unit at Wesley Hospital, at which time he was permanently paralyzed from the neck down and unable to breath without a respirator.

*Margaret Bradford*

She is Sam Pugh's sister. At approximately 7:30 p.m. on July 19, 1975, she was sitting with Jim Carrellas in the front of the meat store at 9401 South Ashland when a man entered and said, "This is a stick-up." After the man determined that the front door was locked, he walked over to them, pulled a gun out of his pants, and said, "I said this is a stick-up. Get in the back." When they entered the back room, in addition to Sam Pugh, Tennis Draper and Terry Howes, she saw Arnold Wilson, who had a gun and was saying, "Where is the cash, where is the cash." She also saw defendant, heard Draper ask him, "Reginald, how could you do this?" and heard defendant answer, "This is the only way I figured I could get my money." She substantially corroborated Sam Pugh's testimony regarding Smith's acceptance of a $500 check from Draper. After Robert Jones shot Draper in the face, she fell to the floor and Jim Carrellas fell on top of her. She heard shots, heard the back door close, and then got up and went to the front of the store, where she called the police. Sam Pugh, whose face was bleeding, came up to her and asked her to take him to the doctor, but she told him the police were coming and they would take everybody. She followed him outside onto 94th Street, where she pulled him down and put his head on her knee, and stayed there with him until the police came.

On cross-examination she acknowledged that she saw Robert Jones take a wallet out of Draper's pocket and then put it back, but denied ever hearing Smith say that he should leave the people's wallets alone.

*For the Defense:*

*Julian Calhoun*

He is a legal investigator for Criminal Defense Services. On August 15, 1975, he telephoned Sam Pugh at his home and the two of them had a conversation. Pugh first told him that Smith didn't have anything to do with the crime, but then said that because Smith had brought the individuals in there he was just as responsible as they were. Pugh also told him that the 15-year-old boy, Terry Howes, was still in intensive care, and they all should get what they deserved on it. He next spoke to Sam Pugh at his home approximately two weeks later for the purpose of getting a signed statement, but he did not obtain one. He saw Pugh for a third time in November of 1975, when he went to 9401 South Ashland to get a physical layout of the meat store there.

On cross-examination he stated that Pugh told him that Smith must have had a gun, although he did not actually see him holding one, and that all three men started shooting. He denied ever asking Pugh to take it easy on Smith, or telling Pugh that nobody could help what had happened and that Draper's life could not be brought back.

584

*James Wilson*

He was employed by Reginald Smith at various places from the middle of June, 1975 through July 19, 1975. Other individuals including Arnold Wilson and Robert Jones were also employed by Smith. Robert Jones had done some work for Smith, but had not been paid for it. On the morning of July 19, 1975, he, Smith, Arnold Wilson, and Robert Jones talked together at Rainbow Beach for approximately three hours. He and Smith left the beach together and drove first to the meat market on 87th Street, and then to the 94th Street store. After they arrived at that store, Smith went inside and stayed there for about five minutes. He then took Smith home.

*Defendant Reginald Smith on his own behalf*

He met Sam Pugh in March 1975 at South Shore Meats on 87th Street, and they agreed that he would come and look at some work that Pugh wanted done on his West Side store. He entered into the contract with Pugh on March 22, and started the work in the beginning of April. Among his employees were Arnold Wilson and Robert Jones. When they started working, Pugh gave him approximately $800. On the day he finished the work, which took approximately one month, he asked Pugh for payment of the balance of the money promised. Pugh indicated that the West Side store had not made enough money at that point, so that he could not afford to pay him. He agreed with Pugh that he could be paid later when business was more profitable.

After the construction work was completed, he delivered meat part-time for the three stores owned by Pugh and Tennis Draper. He always turned in the money or food stamps he collected from the customers, and he never took any of what he collected to satisfy the $500 debt which Pugh owed to him. He still owed approximately $200 to Robert Jones and $100 to Arnold Wilson for work they had done. From the day the work was completed until July 18, he asked Pugh once or twice a week for his $500. On different occasions Pugh gave him $100, $50 and $25. On July 18 he saw Pugh at the West Side store and said that he needed his money. When Pugh told him that he did not have $500 to pay him at one time, he asked him if he could handle $50 a week. Pugh agreed that he could and that the first payment would be made on the following day, July 19. The next morning he saw James Wilson at his home. They met Arnold Wilson and Robert Jones and the four of them went to Rainbow Beach where they had a conversation. Jones threatened him and demanded that he be given his money that day. After he and Jones had talked for approximately two hours, he told Jones that he was getting $50 that day from Pugh and that Jones could have it. He and James Wilson then left the beach and went to the meat store on 87th Street where Tennis Draper told him that Pugh was at the store on 94th and Ashland. When he and James Wilson went to that

store Pugh told him that he did not have the $50 which he had promised him the day before. When he told Pugh that he owed money to people that he had to give them that day, Pugh told him that he should come back on Tuesday because he should have some money by then. He never asked Pugh where he would be at 7 or 7:30 that evening. James Wilson took him home and later took him to meet Robert Jones. Jones asked him why he had not come back with the money and, when he explained that Pugh had not given him his money, Jones accused him of lying. They decided to go to see Pugh in order to determine the truth. They drove to the 87th Street store, where Draper told him that Pugh was at 94th and Ashland. He, Wilson and Jones went to the 94th Street store, where they were let in the side door by Terry Howes. He began talking to Pugh and Draper, who told him they didn't have any money and could not pay him. He noticed a change in Draper's face and saw that he was looking at Robert Jones, who was standing near the front entrance with James Carrellas and Margaret Bradford and holding a gun in his hand. He turned around and discovered that Arnold Wilson also had a gun in his hand. While Draper told him that this wasn't necessary, and he responded that he was not a stickup man and didn't know anything about this, Wilson and Jones began demanding money. He refused an offer of meat or wallets from either Draper or Pugh. Jones started to take Draper's wallet, but he said to him, "Why don't you leave these peoples pockets alone" and Jones withdrew his hand from Draper's pocket. He accepted Draper's offer of a check, and told Draper to make it out to him for no more than he was owed. After he took the check, which he planned to put in his account and use to pay Wilson and Jones, he talked with Wilson and Jones at the rear of the store. Jones then walked over and shot Draper. He ran out the rear door and entered Arnold Wilson's car. Wilson also got in the car, and as they began to pull away from the curb, he was yelling at Wilson that he had ruined their lives. As the car pulled away, Robert Jones grabbed the car door, jumped in, and started fumbling through his pockets while saying that he needed one more bullet. He jumped out of the car and later took a bus out of the area. He called Area 2 Homicide the next morning, and told a police officer his name, the possible whereabouts of Wilson and Jones, and that he had heard the police were looking for him. He turned himself in that afternoon at approximately 4:30 p.m.

On cross-examination he denied knowing what Wilson and Jones were going to do, or intending to commit an armed robbery with them. He acknowledged that Jones had mentioned kidnapping Pugh, but stated that Jones had not mentioned committing a robbery, and that he first knew that Wilson and Jones had guns when he saw them holding the guns in their hands while they were in the store. He admitted that after Draper wrote him out the check, he turned to Wilson and Jones and said, "Look, I

got the money," or something to that effect. He acknowledged that he saw Wilson fire his gun, but stated that he did not see him fire it at anyone. He admitted that he did not call the police until after he found out that they were looking for him.

OPINION

Defendant first contends that the evidence adduced at trial was not sufficient to support his conviction beyond a reasonable doubt. The trial court stated that its finding that defendant was guilty was based upon the theory of accountability. Section 5—2(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c)) provides in pertinent part that a person is legally accountable for the conduct of another when "Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." A defendant is guilty of murder under the felony murder rule when a murder is committed during the commission of a forcible felony other than voluntary manslaughter. (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(3).) We also note that where two or more defendants have a common design to do an unlawful act, any act done by one of them in furtherance of the design is the act of all and all are guilty of whatever crime is committed. (*People v. Nowak* (1970), 45 Ill. 2d 158, 258 N.E.2d 313.) Defendant here argues that it was not sufficiently shown that any of his actions aided or abetted the commission of the offenses involved here, and further that it was not shown that he had the required intent to promote or facilitate such commission.

■■■ The standard by which cases of this type should be judged has been stated by our supreme court to be as follows:

> "While mere presence or negative acquiescence is not sufficient to constitute a person a principal to a crime, one may aid and abet without actively participating in the overt act, and if the proof shows he was present at the crime without disapproving or opposing it, the trier of fact may competently consider this conduct in connection with other circumstances and thereby reach a conclusion that such person assented to the commission of the criminal act, lent his countenance and approval and was thereby aiding and abetting the crime." (*People v. Clark* (1963), 30 Ill. 2d 67, 72, 195 N.E.2d 157, 160.)

The "other circumstances" which were shown to exist in this case indicate that defendant not only was present at the scene of the crimes without disapproving or opposing them, but that he did knowingly assist in their commission. Defendant led Arnold Wilson and Robert Jones to the back door of the meat store at 94th and Ashland where, after they entered and

Wilson and Jones drew their guns, he conducted the negotiations for money. He eventually accepted a check for $500 which, according to his direct examination testimony, he planned to place in his bank account so that he could use the proceeds to pay the debts he owed to Wilson and Jones. He fled the scene in a car driven by Wilson. He left the car only when he suspected that Jones might turn upon him, and he called the police the next day after he heard that they were looking for him. These factors provided ample basis for the trial court, as the trier of fact, to determine the credibility of the witnesses and to reject defendant's explanation that he only acted as he did to placate an explosive situation. (See *People v. Hendrix* (1974), 18 Ill. App. 3d 838, 310 N.E.2d 798.) These factors also serve to distinguish this case from *People v. Robinson* (1974), 59 Ill. 2d 184, 319 N.E.2d 772, in which defendant, while riding in a taxi cab with two companions, pulled out a gun, demanded the cab driver's money, and almost immediately thereafter shot and killed the driver. Our supreme court ruled that the defendant's companions could not be found guilty on the theory of accountability because the evidence showed only that they were present, and did not show that they did anything to assist in the planning or commission of the offense. Defendant's reliance on that case as similar to the instant one is misplaced. As we have indicated above, the evidence adduced at trial showed that defendant, in addition to mere presence at the scene of the crimes, took an active role in their commission. The trial court therefore had a more than sufficient basis to find defendant guilty of the offenses charged. See *People v. Bleimehl* (1972), 9 Ill. App. 3d 273, 292 N.E.2d 60.

■■ ■ Defendant next contends that his constitutional right of confrontation was improperly denied when the trial court did not allow him to cross-examine James Carrellas, a prosecution witness. Although Carrellas was only called by the State as a witness against co-defendant Arnold Wilson, defendant argues that Carrellas gave testimony adverse to him and that he therefore should have been allowed to cross-examine. Defendant is correct that the sixth amendment to the United States Constitution, made applicable on the States by the fourteenth amendment, guarantees the right of an accused to confront the witnesses against him through cross-examination. (*Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065.) A review of the record reveals, however, that Carrellas only mentioned defendant during direct examination by the State when he included him as one of the individuals who was at the scene of the crimes. Defendant also points out that on co-defendant Wilson's cross-examination, it was elicited from Carrellas that defendant accepted the check from Draper. Each of these facts, however, was admitted by defendant, and therefore caused him no apparent harm. This conclusion is supported by the established

presumption that the trial judge, when sitting as the trier of fact, considers only admissible evidence and disregards all inadmissible evidence in reaching his decision. (*People v. Pelegri* (1968), 39 Ill. 2d 568, 237 N.E.2d 453; *People v. Robinson* (1964), 30 Ill. 2d 437, 197 N.E.2d 45.) This presumption is rebutted only when it affirmatively appears from the record that the trial court was misled or influenced by incompetent evidence. (See *People v. Grodkiewicz* (1959), 16 Ill. 2d 192, 157 N.E.2d 16.) The record in this case reveals that throughout the trial, the judge was highly cognizant of the bifurcated nature of the proceedings and, through such steps as excluding the jury and issuing limiting instructions, tried to insure that evidence offered against one defendant would not be considered against another. The awareness of the trial judge that Carrellas' testimony was offered only against Arnold Wilson, coupled with the nonprejudicial effect of the testimony on defendant, leads us to reject defendant's contention that his right of confrontation was improperly denied.

Based on the foregoing, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.