2022 IL App (1st) 210574-U

THIRD DIVISION
September 14, 2022

No. 1-21-0574

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 15 CR 11361 02 |
| | ) | |
| RICHARD MUSTONEN, | ) | Honorable |
| | ) | Brian K. Flaherty, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Justices Rochford and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Affirming the defendant's conviction for first-degree murder where he was not prejudiced by his trial counsel's failure to tender the accomplice-witness pattern jury instruction.

¶ 2    Following a jury trial, defendant Richard Mustonen was convicted of first-degree murder and sentenced to 55 years in prison.  In this direct appeal, defendant contends his trial counsel rendered ineffective assistance by failing to tender Illinois Pattern Criminal Jury Instruction (IPI) No. 3.17, the accomplice-witness jury instruction.  For the reasons discussed herein, we affirm.

¶ 3                                                   BACKGROUND

¶ 4       Defendant and co-defendant Daniel Aguilar, Jr. (Daniel) were indicted for first-degree

murder and armed robbery in connection with the fatal shooting of Manuel Montoya (Manuel).

Daniel pleaded guilty to first-degree murder and was sentenced to 20 years' imprisonment.

¶ 5       Prior to defendant's trial, the State filed a motion seeking use immunity under

section 106-2.5 of the Code of Criminal Procedure of 1963 (725 ILCS 5/106-2.5 (West 2020)).[1]

The State represented that Andrew Smado (Smado) was a material witness who had expressed

that he may assert his privilege against self-incrimination if called to testify at trial.  The trial

court granted the motion, and Smado was granted use immunity.

¶ 6                                                 *Initial Testimony*

¶ 7       During defendant's jury trial in 2020, the testimony included the following.  Analicia

Montoya testified she resided with her husband and 23-year-old son Manuel on 222nd Place in

Sauk Village, Illinois, in May 2015.  Their neighbor Jack Copley (Copley) – who resided at the

corner of 222nd Place and Jeffrey Avenue – testified that in the early morning of May 7, 2015,

he went to his window after hearing gunshots.  He observed an individual staggering toward his

home and collapsing near the sidewalk.  Copley's call to 911 was played for the jury.

¶ 8       Detective Mark Bugajski (Bugajski) from the Sauk Village Police Department testified

that he was a patrol officer in 2015.  After receiving a dispatch call regarding shots fired at

222nd and Jeffrey, Bugajski drove to the scene and observed a male individual lying face down

on the lawn who was bleeding heavily and having difficulty breathing.  When emergency

---

[1] "The use immunity statute provides that if a witness has refused or is likely to refuse to produce evidence on the basis of his privilege against self-incrimination, the State can file a motion that the witness be granted immunity from prosecution in a criminal case as to any information directly or indirectly derived from the production of evidence from the witness." *People v. Ousley*, 235 Ill. 2d 299, 316 (2009).

personnel arrived, they turned over the individual to assess his injuries; Bugajski then recognized the victim as Manuel. Bugajski testified that he observed a trail of blood in the intersection.

¶ 9                                *Amy Clancy*

¶ 10     Amy Clancy (Clancy) testified that defendant was her former boyfriend. They met in 2013 when she was 21 years old. In May 2015, Clancy and defendant resided with their 2-month-old baby and other members of defendant's family in Munster, Indiana. According to Clancy, neither she nor defendant owned a vehicle, so defendant's friend Smado gave them rides. On the afternoon of May 6, 2015, Smado transported them as they performed errands.

¶ 11     Later that same day, Smado picked up defendant, Clancy, and the baby in Munster and dropped them off in Sauk Village at the residence of defendant's friend Daniel, who was known as "Dan-Dan." At some point, defendant and Daniel indicated that they wanted liquor. According to Clancy, a group consisting of defendant, Clancy, Daniel, and Daniel's brother Emilio Aguilar (Emilio) left Daniel's home, while Daniel's sister took care of the baby.

¶ 12     Although Clancy thought they were headed to the liquor store, they walked to the home of defendant's friend Manuel. Clancy testified that defendant wished to purchase cocaine from Manuel but lacked change. Defendant had Smado pick up and drive the group to the liquor store, where they bought liquor and obtained change. The group returned to Manuel's block, where they purchased cocaine from Manuel. Smado then drove the group back to Daniel's home, where they drank and "partied" in the basement (without Smado). Clancy testified that she, defendant, and Daniel "did some cocaine."

¶ 13     After a while, three individuals – defendant, Daniel, and Emilio – went outside to the driveway while Clancy remained in the basement. Defendant subsequently told Clancy to come outside. At that point, Smado had returned in his vehicle. Defendant told Clancy: "Let's go.

3

We're going to the liquor store to get more liquor." Smado drove, and Clancy sat in the front passenger seat. In the back seat, defendant sat behind Clancy, Daniel sat behind Smado, and Emilio sat between Daniel and defendant.

¶ 14    Clancy testified that the group went to Manuel's block. Manuel walked up to the passenger side of the vehicle and spoke with defendant. According to Clancy, defendant directed Manuel to hand the cocaine to Clancy. As Manuel handed her the cocaine, Daniel was kicking Smado's seat. Clancy handed the cocaine back to Manuel, and Smado drove off. Clancy testified that defendant and Daniel were yelling as Smado circled the block.

¶ 15    Smado drove around the block and returned to the area by Manuel's residence. Manuel walked up to the vehicle, and defendant again instructed him to hand the cocaine to Clancy. Manuel complied, and Clancy handed the drugs to defendant. Clancy testified that, at that point, Manuel told defendant, "You're supposed to be my best friend," and the two men argued. According to Clancy, the group took the cocaine, and Manuel realized that he would not be paid.

¶ 16    Clancy testified that she then looked to her right and observed defendant holding a firearm. Defendant fired the weapon through the open window of the vehicle. Smado drove away, and the group returned to Daniel's residence. Defendant told Clancy to check on the baby, and defendant, Daniel, and Emilio went to the basement. At 2 a.m. or 3 a.m., defendant called Smado and told him to pick them up and take them home to Munster.

¶ 17    As Clancy exited the vehicle in Munster, she noticed a shell casing on the vehicle floor. She informed defendant about the casing, and he walked to the side of the house with the casing. Clancy testified that defendant stated that she was "going to be next" if she reported him.

¶ 18    When questioned regarding her cell phone, Clancy testified that defendant frequently

used her phone; defendant had used her cell phone throughout the events of May 6 and 7, 2015.

¶ 19    During cross-examination, Clancy testified that Daniel wore a mask as he sat in the backseat of Smado's vehicle.  She testified that defendant had liked Manuel; Daniel, however, did not.  According to Clancy, defendant had cheated on her and mistreated her.  Clancy testified that when she was questioned by the police approximately one week after the shooting, she initially claimed that she had been at home and had not witnessed the shooting.  Clancy was subsequently questioned by two detectives in a windowless room at the police station.  Clancy testified that she continued to lie to the police.  After requesting an attorney, she was placed in a cell for a few hours.  The police then brought her back to the windowless room, where she cried and was distraught.  She eventually informed the police that defendant had a firearm and had shot Manuel.  Upon questioning by defense counsel, Clancy acknowledged that she could be criminally charged and that she did not want to "go back to jail."  On redirect examination, Clancy testified that the State had not made any promises or threats toward her.

¶ 20                              *Andrew Smado*

¶ 21    Smado testified that he was 50 years old, he resided in Chicago Heights, Illinois, with his parents, and he was "on disability."  He testified that he grew up with defendant.  Smado confirmed that he was granted use immunity and could not be prosecuted for his testimony.

¶ 22    Smado testified that he drove defendant and Clancy as they ran errands on May 6, 2015.  Defendant later contacted Smado and asked him to drive defendant, Clancy, and their baby to Sauk Village.  After dropping them off at Daniel's residence, Smado returned home.  Smado had met Daniel on one prior occasion.

¶ 23    According to Smado, defendant subsequently called him to pick him up on a street in Sauk Village.  Smado picked up defendant, Clancy, Daniel, and Emilio and drove them to a

liquor store. He next drove the group to Manuel's block, where Manuel handed cocaine to Daniel; Smado had never met Manuel before. Smado then drove the group to Daniel's home.

¶ 24 Smado testified that he subsequently drove the group back to the same area where they had previously purchased drugs. After circling the block, Smado stopped the vehicle and Manuel handed cocaine to Clancy. Smado testified that, at that point, his foot slipped off the brake, and the vehicle moved slightly. According to Smado, Manuel then started to climb through the window of the vehicle. Defendant told Manuel something to the effect of "[y]ou don't want to do this at this time." Smado testified that as Manuel backed away from the vehicle, defendant pointed a firearm out of the window. Smado heard multiple "pops" and drove away. He dropped the group off at Daniel's residence and returned home.

¶ 25 At 2:30 a.m., defendant called Smado, and Smado picked up defendant, Clancy, and their baby and drove them to Munster. Smado testified that as they pulled up at defendant's home, Clancy stated that there was a shell casing in the back seat. As defendant exited the vehicle, he stated that if anyone "snitches," he would shoot Smado and his family. Smado drove home.

¶ 26 On cross-examination, Smado testified that he never observed Daniel wearing a mask. Although he heard gunshots, Smado did not view the shooter as he was looking straight ahead. Smado confirmed that he had been made aware that he could have been criminally charged.

¶ 27                                    *Emilio Aguilar*

¶ 28 Emilio, who was 24 years old at the time of the trial, testified that, in May 2015, he was a high school senior who was living with his mother, older brother Daniel, and other siblings. On May 6, 2015, defendant, Clancy, and their baby visited them. At approximately midnight, Daniel asked Emilio if he wanted to take a ride; Emilio did not know the driver of the vehicle.

¶ 29 A group consisting of the driver, Daniel, defendant, Clancy, and Emilio drove a short

distance when Emilio observed his friend Manuel walk up to the vehicle and commence a conversation with defendant and Clancy regarding cocaine. Then the group drove away without the cocaine and circled the block. The vehicle returned to the same corner, and Manuel handed cocaine to Clancy. The vehicle started to move, and Manuel put his head inside the vehicle and attempted to grab the drugs.

¶ 30    Emilio then observed defendant pull out a firearm, point it at Manuel, and state something to the effect of "[t]his is not what you want." Manuel backed up from the vehicle. As the vehicle drove away, defendant placed the firearm through the window and fired at Manuel. Emilio testified that he was shocked. He observed Manuel stumbling and holding his neck. The group then returned to the Aguilar residence, where Emilio went to his room. According to Emilio, defendant and Daniel were arguing as they went to Daniel's room; Emilio remained in his room and "just had like a panic attack."

¶ 31    Emilio testified that he was arrested after failing to appear in court on a prior date in this matter. His understanding was that, after he testified, a contempt charge would be dismissed.

¶ 32    During cross-examination, Emilio testified that he and Daniel were trying to avoid defendant on May 6, 2015. When questioned as to whether he previously went to the liquor store or purchased cocaine from Manuel on that date, Emilio responded that he did not remember doing so. He also did not recall Daniel wearing a mask or kicking Smado's seat. Emilio admitted, however, that he had told the police in May 2015 that he thought his brother had been wearing a mask. Emilio testified he loved Daniel, and he wanted to protect Daniel and himself.

¶ 33                                    *Daniel Aguilar*

¶ 34    Daniel, who appeared via Skype videoconferencing due to COVID-19 restrictions, testified that he was 28 years old and was serving a 20-year prison sentence for first-degree

murder for his involvement in the fatal shooting of Manuel. Daniel was living with his mother and some of his siblings in Sauk Village on May 6, 2015. At approximately 6 p.m. on that date, defendant, Clancy, and their baby came to his residence. Daniel considered defendant to be a good friend.

¶ 35    Daniel testified that a group consisting of himself, defendant, Clancy, and Emilio[2] decided to walk to a liquor store. Smado then picked them up and transported them to purchase cocaine from Manuel. The group returned to Daniel's residence and used the cocaine.

¶ 36    According to Daniel, he and defendant conversed regarding a problem with their drug purchase, as they felt that the bag of cocaine was "kind of short." Daniel testified that he and defendant decided to rob Manuel of some cocaine. Daniel confirmed that defendant had a .380 semi-automatic pistol, where the "shell casings come flying off of it when you fire it."

¶ 37    Smado drove Daniel, defendant, Clancy, and Emilio to Manuel's residence. When Manuel approached the vehicle, Daniel was wearing a mask, as he intended to rob Manuel and did not want to be recognized. Daniel testified that the plan was to obtain drugs and drive off. After Manuel handed the drugs to Clancy, however, Smado hesitated, and Daniel began kicking the back of his seat and directing him to leave. Defendant shot at Manuel through the window of the vehicle.

¶ 38    Daniel testified that he was upset and had told defendant: "What the f***, man? You better not have hit him, you know?" The group returned to Daniel's residence, and everyone except Smado entered. After 20 minutes, defendant, Clancy, and the baby left.

¶ 39    On cross-examination, Daniel testified that he pleaded guilty to first-degree murder and received the minimum sentence of 20 years. He admitted that he repeatedly lied when speaking

---

[2] Daniel subsequently testified that his brother Hondo – not Emilio – walked to the liquor store.

with police after the shooting. Defense counsel questioned Daniel regarding his inconsistent responses to the police; he initially indicated that defendant stated he would kill Manuel but later denied that defendant made the statement.

¶ 40                                    *Stipulations*

¶ 41    The stipulations read to the jury included the following. Detective Mark Akiyama of the Olympia Fields Police Department – who was assigned to the South Suburban Major Crimes Task Force – would testify that he extracted data from Manuel's cell phone[3] which revealed text messages between Manuel and "Richie" on May 6 and 7, 2015. "Richie" relayed that he needed a "dub" ($20 worth of drugs), and he was "at dandan" ("Dan-Dan" – Daniel's nickname) in the "village" (Sauk Village). Manuel responded that they would meet on his corner. A few hours later, "Richie" texted that he needed another "dub." He told Manuel: "I want to see that [s***] cause that [s***] you gave me wasnt a full dub." As they made plans to meet again, Manuel responded that "[it] was a dub I dnt sell no skimpy [s***]."

¶ 42    Other stipulations provided that: (a) Manuel had died from a gunshot wound to his neck; (b) the weapon appeared to have been fired from a distance of more than 18 inches; (c) a .380 9-millimeter bullet was recovered from Manuel's body during the autopsy; and (d) DNA evidence suggested that defendant was seated on the rear passenger side of Smado's vehicle.

¶ 43                    *Jury Instructions, Closing Arguments, and Conviction*

¶ 44    The trial court denied defendant's motion for a directed verdict. Defendant did not testify, and the defense did not call any witnesses. The trial court then proceeded to a jury

---

[3] Detective Robert Grossman (Grossman), who was formerly employed by the Sauk Village Police Department, testified that a cell phone owned by Manuel had been recovered from the crime scene. According to Grossman, a series of text messages had been exchanged immediately prior to the shooting. The other participant in the text exchange was identified as "Richie," and the associated telephone number was registered to Clancy.

instructions conference. The instructions provided to the jury included IPI 1.02 (regarding the jury as the sole judge of the believability of witnesses), IPI 3.11 (regarding prior inconsistent statements), and IPI 3.12 (regarding impeachment of a witness by prior convictions). Defense counsel did not request, and the trial court did not provide, the accomplice-witness instruction (IPI 3.17).

¶ 45 During closing arguments, defense counsel argued, in part, that the occurrence witnesses – Clancy, Smado, Emilio, and Daniel – were "four liars, admitted liars." The State conceded that these witnesses were "admitted liars" but contended that the "investigation completely came together, and everybody started telling the truth."

¶ 46 After the State nol-prossed multiple counts, defendant was found guilty of first-degree murder. The trial court denied defendant's motion for a new trial. Defendant was sentenced to a total of 55 years' imprisonment. The trial court denied his motion to reconsider his sentence, and defendant filed this timely appeal.

¶ 47 ANALYSIS

¶ 48 Defendant argues on appeal that his trial counsel was ineffective for not requesting that the trial court instruct the jury to treat the testimony of accomplice witnesses with suspicion and caution, in accordance with IPI 3.17. IPI 3.17 provides as follows:

> "When a witness says he was involved in the commission of a crime with the
>
> defendant, the testimony of that witness is subject to suspicion and should be
>
> considered by you with caution. It should be carefully examined in light of the
>
> other evidence in the case." IPI 3.17.

The State contends that defense counsel was not ineffective for choosing not to tender IPI 3.17 where the jury was sufficiently warned to view the witnesses' testimony with suspicion and

caution and the State's evidence – apart from the accomplice-witness testimony – was strong.

The State also asserts that the decision not to request the instruction was a matter of trial strategy.

¶ 49                              *Ineffective Assistance of Counsel – General Principles*

¶ 50     The United States Constitution and the Illinois Constitution both guarantee criminal

defendants the right to effective assistance of counsel. *People v. Hale*, 2013 IL 113140, ¶ 15;

U.S. Const., amend. VI; Ill. Const. 1970, art. 1, § 8. To establish ineffective assistance of

counsel, a defendant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466

U.S. 668 (1984), demonstrating that: (1) counsel's performance fell below an objective standard

of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different. *People v. Patterson*, 2014 IL

115102, ¶ 81.

¶ 51     In establishing substandard performance, a defendant must overcome the strong

presumption that his counsel's actions were the product of sound trial strategy and not

incompetence. *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 26. "A defendant is entitled to

competent, not perfect, representation, and mistakes in trial strategy or judgment will not, of

themselves, render the representation ineffective." *Id.*

¶ 52     As to the prejudice prong, "reasonable probability" is defined as "a showing sufficient to

undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair."

*Patterson*, 2014 IL 115102, ¶ 81. Satisfying the prejudice prong necessitates a showing of actual

prejudice, not simply speculation that the defendant may have been prejudiced. *Id.* See also

*People v. Evans*, 209 Ill. 2d 194, 220 (2004) (noting that a "reasonable probability of a different

result is not merely a possibility of a different result").

¶ 53     In order to prevail on a claim of ineffective assistance of counsel, both *Strickland* prongs

must be satisfied. *Tucker*, 2017 IL App (5th) 130576, ¶ 27. Thus, if a claim of ineffective assistance can be disposed of based solely on the prejudice component, we need not determine whether counsel's performance was deficient. *People v. Graham*, 206 Ill. 2d 465, 476 (2003). Where, as here, a claim of ineffective assistance was not raised in the trial court, our review is *de novo*. *People v. Hunt*, 2016 IL App (2d) 140786, ¶ 51.

¶ 54    An attorney's failure to request a particular jury instruction may be grounds for finding ineffective assistance of counsel, only if the instruction was so critical to the defense that its omission denied the right of the defendant to a fair trial. *People v. Rodriguez*, 387 Ill. App. 3d 812, 828 (2008). As discussed further below, counsel may render ineffective assistance by failing to tender the jury instruction for accomplice-witness testimony. *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 25.

¶ 55                    *Accomplice-Witness Instruction*

¶ 56    Illinois courts have "long deemed it appropriate to advise juries that an alleged accomplice's testimony may be viewed with suspicion." *People v. Fane*, 2021 IL 126715, ¶ 35. "The underlying rationale is that it is fair to question the testimony of a witness who has admittedly participated in the crime at issue in the proceedings." *Id.* As our supreme court has observed, the testimony of an accomplice is that of a confessed criminal. *Id.* ¶ 47.

¶ 57    The purpose of IPI 3.17 is to "warn the jury that the witness might have a strong motivation to provide false testimony for the State in exchange for immunity or some other lenient treatment." *Hunt*, 2016 IL App (2d) 140786, ¶ 52. But see *Fane*, 2021 IL 126715, ¶ 45 (noting that one of the purposes of the instruction is to caution the jury that the witness may be testifying falsely in exchange for favorable treatment from the State, but "it is equally plain that courts have looked askance at an accomplice's testimony regardless of which party offers it and

have upheld issuing the instruction when the witness gave exculpatory testimony for the defendant").

¶ 58     The accomplice-witness instruction should be given "if the totality of the evidence and the reasonable inferences derived from the evidence establish probable cause to believe that the witness participated in the crime, as either a principal or an accomplice." *Hunt*, 2016 IL App (2d) 140786, ¶ 52.  Accord *People v. Harris*, 182 Ill. 2d 114, 144 (1998) (stating that "[t]he appropriate test in determining the need for an accomplice instruction is whether there is probable cause to believe that the witness was guilty of the offense in question, either as a principal or, under a theory of accountability, as an accessory"); *People v. Davis*, 353 Ill. App. 3d 790, 795 (2004) (same).  If probable cause is established, IPI 3.17 should be given "despite the witness' protestations that he or she did not so participate." *People v. Caffey*, 205 Ill. 2d 52, 116 (2001).

¶ 59     "An accomplice must participate in some part, perform some act, or owe a duty to the person in danger to make him responsible to prevent the crime." *Zambrano*, 2016 IL App (3d) 140178, ¶ 26.  See also *People v. Strickland*, 2019 IL App (1st) 161098, ¶ 43 (providing that the accomplice-witness instruction should be given "[i]f, under the totality of the evidence and the reasonable inferences drawn therefrom, the evidence establishes probable cause to believe that the witness was present at the crime, failed to disapprove of the crime, and that he participated in the planning or commission of the crime").  An individual is not accountable by his mere presence at the scene of the crime or his acquiescence in the criminal act. *Zambrano*, 2016 IL App (3d) 140178, ¶ 26.

¶ 60                              *Counsel's Performance*

¶ 61     Defendant contends on appeal that all four of the occurrence witnesses – Clancy, Smado,

Emilio, and Daniel – satisfied the criteria to be considered an accomplice for the purpose of IPI 3.17. The State concedes that Daniel was an accomplice but contends that the other three individuals were not. As to Daniel, the State asserts that defense counsel's decision to not request IPI 3.17 was a matter of trial strategy.

¶ 62 Based on our review of the record, we agree with the State that Clancy, Smado, and Emilio did not constitute "accomplices" under IPI 3.17. While all three individuals were present at the shooting, mere presence is not sufficient, as noted above. *E.g.*, *Harris*, 182 Ill. 2d at 145; *People v. Wheeler*, 401 Ill. App. 3d 304, 312 (2010); *People v. Iniguez*, 361 Ill. App. 3d 807, 816 (2005). The record does not suggest that they knew about the robbery or the shooting before the events transpired (*People v. Love*, 285 Ill. App. 3d 784, 792 (1996)) or that they were aware that defendant was armed. See *People v. Robinson*, 59 Ill. 2d 184, 192 (1974). While Clancy admitted that she used cocaine, "[a]n accomplice is not somebody who was an admitted participant in an offense distinct from the one at bar, even if the offense was related to the charge being tried." *Love*, 285 Ill. App. 3d at 791-92. Although Clancy was released from police custody after she had implicated defendant, there is no indication that the police made any special type of arrangement with Clancy. *People v. Howard*, 209 Ill. App. 3d 159, 176 (1991). Clancy and Smado testified that they were aware of the possibility of their prosecution, and Smado was granted use immunity. We note, however, that charges were never filed against them, and even the placement of charges does not automatically determine an individual's status as an accomplice under IPI 3.17. See *Harris*, 182 Ill. 2d at 145. We further observe that testimony regarding defendant's threats against both Clancy and Smado – and Emilio's testimony regarding his shock and apparent "panic attack" after the shooting – are not consistent with the theory that they participated in the planning or commission of the crime.

¶ 63    Conversely, Daniel was clearly an accomplice for purposes of IPI 3.17, as he had pleaded guilty to the first-degree murder of Manuel at the time of defendant's trial. The State contends, however, that counsel was not necessarily deficient for failing to request the accomplice-witness instruction, as the typical justification for the instruction – *i.e.*, a witness's motivation to provide false testimony in exchange for favorable treatment – was not present where Daniel already admitted his guilt and was serving a 20-year prison sentence. The State further contends that requesting IPI 3.17 "would only link defendant to Daniel's admitted guilt by reminding the jury that the two were 'accomplices,' and highlight that Daniel, testifying from prison, had accepted responsibility for his role in the murder already."

¶ 64    Despite their facial appeal, we reject the State's contentions. As an initial matter, while we agree that Daniel's guilty plea arguably negates the possibility of favorable treatment for him, the involvement of his younger brother Emilio in the trial court proceedings could theoretically provide a motivation for testimony implicating defendant. We further observe that courts have consistently found no valid reason for not requesting IPI 3.17 when accomplices testify. *Hunt*, 2016 IL App (2d) 140786, ¶ 52; *Davis*, 353 Ill. App. 3d at 795. See also *Fane*, 2021 IL 126715, ¶ 39 (noting that the Supreme Court Committee on Jury Instructions in Criminal Cases has recommended that IPI 3.17 be given any time an accomplice testifies).

¶ 65                                        *Prejudice*

¶ 66    Even if we assume that trial counsel's failure to request IPI 3.17 amounted to deficient performance, we find that defendant has failed to establish a reasonable probability that the result of his trial would have been different if the instruction had been given, based on the strength of the evidence presented and the instructions actually received by the jury. See *People v. McCallister*, 193 Ill. 2d 63, 91 (2000); *Hunt*, 2016 IL App (2d) 140786, ¶ 63. We further note, if

given, the accomplice-witness instruction would have had no effect on the jury's assessment of the witnesses presented by the State, other than Daniel. See *McCallister*, 193 Ill. 2d at 95.

¶ 67    During oral argument before this Court, defense counsel characterized the "totality of the evidence" as "accomplices corroborating accomplices." As the State presented significant evidence apart from Daniel's testimony, we reject this characterization. Clancy, Smado, and Emilio all testified that they observed defendant with a firearm and that they viewed or heard the shooting. Although there were certain discrepancies in their respective testimonies, each described the same key events – a drug transaction, a dispute between defendant and Manuel, and a shooting. The text messages between Manuel and "Richie" – presumably defendant Richard Mustonen – supported the proposition that defendant was dissatisfied with his prior drug purchase and intended to rob or otherwise punish Manuel. The DNA evidence from Smado's vehicle strongly suggested that defendant was in the rear passenger seat, providing a vantage point for him to shoot Manuel. Furthermore, the forensic evidence indicated the weapon was fired from a distance of more than 18 inches – and that Manuel was shot in the neck – which are both consistent with the testimony that defendant fired at Manuel as he backed away from the vehicle.

¶ 68    In addition, we observe that the jury received IPI 1.02, which instructed the jurors to consider any interest, bias, or prejudice the witnesses may have, as well as IPI 3.11 regarding prior inconsistent statements and IPI 3.12 regarding impeachment of a witness by prior convictions. We further note that the jury received IPI 1.01, which instructed the jurors, in part, to consider all of the evidence in light of their own observations and experiences in life. These instructions – coupled with counsels' arguments – clearly warned jurors that they should view Daniel's testimony with suspicion. See *Hunt*, 2016 IL App (2d) 140786, ¶ 62.

¶ 69     As discussed above, failure to prevail on either prong of the two-part test under *Strickland* is sufficient to defeat a claim of ineffective assistance of counsel. *Love*, 285 Ill. App. 3d at 793. Considering the totality of the circumstances, based on the record before us, defendant cannot establish that he was prejudiced by his counsel's failure to tender IPI 3.17, and he therefore cannot succeed on his claim of ineffective assistance of counsel. See *Hunt*, 2016 IL App (2d) 140786, ¶ 64. See also *Patterson*, 2014 IL 115102, ¶ 87 (observing that the defendant failed to establish the prejudice prong under *Strickland* where the "reasonably probable impact of counsel's alleged error is not sufficient to undermine our confidence in the outcome of the trial").

¶ 70                              CONCLUSION

¶ 71     The judgment of the circuit court of Cook County is affirmed in its entirety.

¶ 72     Affirmed.